Howry, Judge,
delivered the opinion of the court:
The 11 different interests appearing here were united fohearing at the same time to obtain reports together to the Congress under the fourteenth section of the act of March 3, 1887 (24 Stat., 505, c. 359). After the cases were consolidated, by consent, they were remanded with leave to all the claimants to amend and take testimony. It had not been shown that the payments for the expenses alleged to have been incurred had been made, but the allegation on that point rested in each case entirely upon the belief of an army officer, which was insufficient to prove a material fact. (Jones & Laughlins et al. v. United States, 42 C. Cls. R., 178.)
The findings now show payment in 7 of the original petitions, but the competent evidence does not establish the payment of any amount in the claims of James Wood & Co. and Lyon, Shorb & Co. The claim set forth in the petition of Singer, Nimmick & Co., has been abandoned because the principal party in interest deemed it better to discontinue on account of the number of heirs and the smallness of the share of each and from the fact that he was too busy to give the matter attention. The claim of King & Pennock has likewise been abandoned by the claimants because the facts could not be proved.
Bills for the relief of the parties directed the Secretary of the Treasury to pay out of any money not otherwise appropriated the sums of money expended and paid by the claimants, or by the firms respectively represented by them, “ for labor and materials furnished in eighteen hundred and sixty-three to General Brooks and the fortifications around Pittsburg, Pennsylvania, for the benefit of the United States.”
*239 The reference of these bills with the accompanying papers creates no cause of action and no legal right save that of making the Government defendant in a judicial tribunal, and of having the facts found with an amount. Because it is sometimes erroneously stated that the reports transmitting our findings of fact under the fourteenth section' of the statute cited are “ allowances ” in the full sense in which the term is employed as applied to the action of judicial tribunals, the court takes occasion to show that references of the kind here mentioned are merely ancillary and advisory to Congress.
This is entirely plain from the language of the section, but is adverted to because of the confusion created by the frequent repetition of the statement that the action of the court in finding facts has the same effect as in cases under the general jurisdiction, where judgment may be rendered against the Government with the right of appeal to the Supreme Court in all cases where the judgment is against the United States. In finding and reporting facts in cases strictly congressional there is no implication that any claim referred under the fourteenth section of the Tucker Act is well founded in law.
The findings on these particular claims which show payments for certain expenses incurred do not mean that the court “ allows ” the amounts or recommends payment. Nor do the findings raise any implication that the claims were ever payable at law or in equity. On the contrary, they were never actionable under any rule or statute.
But it is alleged in the respective petitions that the claims were presented to the War Department for payment in 1866. That is true. In 1815 the claims appear to have been sent to the accounting- officers of the Treasury, and upon the suggestion of the third auditor were allowed. But this officer’s decision was overruled, and in 1890 the Secretary of the Treasury referred the claims to this court under section 1063 of the Revised Statutes. As the reference did not give the court jurisdiction the claims were returned to the Secretary of the Treasury with the statement that the cases were res judicata in the department; that is, against payment. (Arm *240 strong et al. v. United States, 29 C. Cls. R., 148.) Applications were subsequently made to Congress for payment.
The claims are of a class. They all originated early in June, 1863, when the citizens of Pittsburg, Pa., became alarmed for the safety of the place because the military forces under command of General Lee were invading Pennsylvania and West Virginia, 155 miles east. The citizens of Pittsburg appointed a committee of their number to wait on the Secretary of War and General Halleck and request that skillful engineer officers be detailed to superintend the construction of fortifications around their city. The committee was informed by the Secretary of War that the fortifications around Pittsburg constituted no part of the plan or purpose of the War Department to defend, and that the men and money at the disposal of the department were needed to carry out other purposes, and that neither men nor money could be furnished, but that the citizens must do the work themselves at their own expense.
Pursuant to the request made by the citizens aforesaid upon the United States to cooperate with them, an order was issued assigning General Brooks to command.in that region with instructions to put Pittsburg and Wheeling in a defensible condition, inasmuch as Pittsburg would be a point aimed at by the possible raid of a cavalry command under General Stuart. General Brooks was directed to inform the people of Pittsburg that they must be at work, and the business men of Pittsburg under information from that officer responded to the call for labor on defensive works and in-trenchments. Before any of the work was done, however, General Halleck addressed a letter of instruction to Brigadier-General Barnard, the U. S. engineer officer who was sent by the Government to Pittsburg, under date of June 8, 1863, stating that it was not anticipated that any hostile demonstrations would be made against Pittsburg other than a mere raid, and as any projected works must be constructed by the voluntary labor of the citizens the defenses should be of limited extent and of the most simple character. General Halleck also stated that the mayor and municipal authorities of Pittsburg should be consulted, and that it should be distinctly understood that there was no appropriation for *241 fortifying Pittsburg, and “ to give to the citizens of Pitts-burg such assistance and instruction as might be practicable in preparing themselves against a possible raid.” Certificates as to these claims were given in which the principal officer on duty there certified that he believed the amounts were paid.
When payment was asked of the Government the demands were referred to the claims commission of the War Department, which decided against their validity on the ground that the expenses were incurred by the citizens for their personal protection and that of their property; that it was an independent and spontaneous movement on the part of the citizens entered into without reference to the plans and arrangements of the authorities; and that the whole affair was a private enterprise on the part of the citizens not needed in the opinion of the military authorities or embraced in their plan of operations, but which the department was willing to further in the manner proposed by the citizens in order to allay public excitement and induce a greater feeling of security. The Secretary of War (Stanton) approved and affirmed the decision of the claims commission, and upon a resubmission in 1872 the claims were referred to the Chief of Engineers of the United States Army, who reported that he could see no good reason for the payment of these or of the remaining 158 claims of similar character. May 11,1875, the Assistant Judge-Advocate-General of the Army'' made a report to the Secretary of War stating that no liability existed on the part of the War Department, because it appeared that the labor and expenditures were voluntary acts on the part of the claimants.
. Whether the claimants are entitled or not entitled to an appropriation on the findings is not a question before the court. If the power which holds the purse strings of the nation shall in the exercise of its discretion apply public money to the payment of these claims that is the right of the Congress. But that right can not be made to rest upon the existence of a claim in the sense of the law.
There are circumstances where the Government may recognize as equitable matters that appeal to the public conscience. It has been pointed out by the Supreme Court that some of *242 the acts directing payment have been based upon considerations “ of pure charity ” — payments not of right but in the nature of gratuities. The claims at bar may come within this category; but none of them depend upon any such right as to make them legal claims to reimbursement. In so far as they depend upon equitable considerations the court can not ignore the ruling of the Secretary of War. Congress only can do that with full knowledge of the facts.
As to these claims, the effect that may be given to the contentions of the claimants that their demands are equitable must depend upon whatever view the Congress may assert with respect to the right of the petitioners to recover from the Public Treasury expenditures made for the supposed defense of their locality as a part of the whole country under the circumstances attending the voluntary disbursement of money from their own private means.
The status of the claims being given, it is for Congress to take such action as may be deemed proper in the discretion of those bodies.